**EAGLESON, Admr. v McKEE, et**

Probate Court, Franklin Co.

No. 81535.   Decided Nov. 18, 1939.

Addison, Isaly & Addison, Columbus, for Marie Burkhart and Louise Gloeckner.

C. Eugene Smith, Columbus, for William S. McKee.

Arthur Rowe, Columbus, Associate Counsel with Mr. Smith.

**OPINION**

By McCLELLAND, J.

This matter comes on for hearing on the Petition to Determine Heirship filed by the administrator de bonis non, the answer and cross petition of William S. McKee, and the evidence adduced in support of the allegations of the pleadings.

The plaintiff in his petition alleges that he is the duly appointed and qualified administrator de bonis non with the will annexed of the Estate of Marie McKee, who died testate on the 7th day of November, 1937; that said decedent left a will which was admitted to probate by this Court on the 1st day of December 1937. The petition further alleges that Marie McKee died owning certain real estate therein described. The plaintiff further alleges that the application to admit the will

to probate contains a representation that William S. McKee is the surviving spouse of Marie McKee and that Pauline Newland, Millvale, Pennsylvania, Marie Burkhart, Millvale, Pennsylvania, and Louisa Gloeckner, Millvale, Pennsylvania, defendants are the only known heirs and next of kin or devisees and legatees of said decedent entitled to share in the distribution of said estate; that there are no other parties known to plaintiff claiming a share in the distribution in said estate.

The plaintiff further alleges that William S. McKee elected to take under the statute of descent and distribution, and prays that the Court determine the persons who are entitled to share in the estate, and the respective shares therein.

To this petition William S. McKee has filed an answer in which he admits the truthfulness of the allegations of the petition. The said William S. McKee alleges that he is the surviving spouse of Marie McKee, and that he and Marie Dietz were married in the City of Columbus, Ohio, on August 17, 1919; and that on said date they entered into an agreement and contract of marriage; and that then and there the said Marie Dietz and William S. McKee became wife and husband, and from that day they continued to live as husband and wife until the death of said Marie McKee; and that William S. McKee, the surviving spouse provided all the necessary furniture and equipment to establish said home between August 1919 and November 1937, and that by their joint efforts they purchased the real and personal property described in the petition.

He further alleges that he has elected to take under the statutes of descent and distribution, and not under the provisions of the last will and testament, and that by virtue thereof, he is entitled to receive one-third of the net estate, in addition to the statutory exemption of twenty per-cent thereof, as provided by §10509-54 GC, and that said exemption amounts to the sum of $1041.70, and that he is entitled as said surviving spouse to remain in the mansion house for one year free of rent.

The cross-petitioner asks that the court find that there was a valid contract of marriage, that he elected to take under the statute of descent and distribution, and that he is entitled to participate in the estate of Marie McKee as surviving spouse.

At the trial of this case, which consumed a portion of several days, William S. McKee was offered as a witness. Counsel for the daughters of Mrs. McKee objected to the testimony of Mr. McKee, alleging that he was incompetent as a witness by virtue of the provisions of §11495 GC. This question has caused this court a considerable degree of difficulty, and it seems that if the statute were strictly enforced, Mr. McKee would be an incompetent witness. But, upon an examination of the cases in which the validity of a common law marriage was in question, the alleged surviving spouse was permitted to testify. Without going into a discussion of the various authorities cited, we will simply announce our conclusion, and that is this court feels that the alleged surviving spouse is competent to testify as to all facts supporting the various elements necessary to constitute a valid common law marriage. The marriage relationship is not presumed as a matter of law, but it must be proven, and, until it is proven, it is our opinion that the surviving spouse is not precluded from testifying by virtue of the above named statute.

We therefore hold that Mr. McKee was a competent witness to testify as to all facts tending to support his contention that a valid common law marriage was consummated between the parties.

We now come to the question as to whether or not a valid common law marriage was consummated between the parties. We must first consider the degree of proof which is necessary in order to sustain the contention of a common law marriage,

"So it would seem that marriage rests on contract, and the state recognizes it as a civil contract, and it may be

proved by competent parol proof and circumstances when the degree of proof is clear and satisfactory to the court or jury."

**Umbenhower, by Etc. et v Labus, by etc. et, 85 Oh St p. 238.**

The latest pronouncement by the Supreme Court of Ohio relative to the degree of proof required to sustain a common law marriage, is found in **Re Estate of Redman; Hiland, Appellee v The State of Ohio, Appellant, reported in 135 Oh St p. 558**, in which the Court uses the following language:

"So-called common-law marriage contravenes public policy and should not be accorded any favor; indeed, it is quite generally condemned. It is well settled in Ohio that to establish a common-law marriage, all the essential elements of such a relationship must be shown by clear and convincing evidence. The statutes of Ohio contain definite regulations and requirements and prescribe rigid standards to which applicants for marriage license must conform. While these statutory provisions do not of themselves specifically prohibit marriage without the formalities enumerated by those provisions, such informal marriages are seldom recognized and are held valid by courts only to protect the rights of innocent persons. In the Umbenhower case, supra, the legitimacy of a child was involved and was an important factor in the decision of that case. Even in such cases, the essential elements of such marriage must be established by the degree of proof stated."

It therefore becomes apparent that the latest pronouncement by the Supreme Court relative to the degree of proof is the most strict one and of course is the one by which this court is bound when we come to consider the weight of the testimony, and we therefore hold that in order to sustain the contention of the cross-petitioner that a valid common law marriage was consummated between the parties, the degree of proof must be such that is clear and convincing to the mind of this court.

It is a well established principle of law that in order to sustain a common law marriage, there must be proof of an explicit contract, either in writing or in parol. It must be a contract of marriage at the time of the contract and not a promise in the future. A contract of marriage must be followed by cohabitation as husband and wife, and, in addition thereto, there must be a holding out to the public by both parties that they are husband and wife.

We have examined the transcript of the testimony most carefully, and have also carefully considered the contentions of counsel as expressed in their respective briefs submitted to this court, and also their contentions as expressed in their oral arguments in open court, and we have come to the conclusion that the parties did hold themselves out as husband and wife from the time of the alleged marriage up until the date of the death, and the degree of proof on this point is clear and convincing to this court.

As to the consummation of the alleged marriage contract, this court has had considerable more difficulty. It is significant that the only direct evidence of the making of the contract was the testimony of Mr. McKee the alleged surviving spouse of Marie McKee. Although we hold Mr. McKee to be a competent witness, we must consider that he was an interested party and would profit as a result of his testimony in case the court should give his testimony full credibility. The testimony also discloses that Marie McKee, prior to the date of the alleged marriage had entered into two ceremonial marriages in the State of Pennsylvania, her first marriage being to a man by the name of Hufnagle, and the second marriage to a man by the name of Dietz. She was evidently a woman of mature years and knew the meaning and significance of a civil marriage.

Mr. McKee was a man of mature years and at that time apparently was a man of 44 or 46 years of age.

We are therefore considering the acts not of impetuous youths, but the acts of mature adults of sound mind.

The testimony further discloses that Mr. McKee formerly lived in Pennsylvania in the same community in which lived Marie McKee or Marie Dietz. The testimony discloses that they were acquainted for some time before Mr. McKee came to Columbus. It also discloses that they had some communication by mail after he came to Columbus, Ohio, and while she was still living in Pennsylvania. It also discloses that he had made some trips back to Pennsylvania after he had established his residence in Columbus. But it is significant that Mr. McKee testified that marriage was not mentioned or contemplated by either of the parties prior to the date on which the alleged marriage was consummated.

The testimony of Mr. McKee at certain points is so significant that we deem it advisable to quote certain portions of same. At page four of the record Mr. McKee uses the following language:

"THE WITNESS: Yes, sir. Laura Holt and I were to go to the Elks Dance and she took Marie McKee, then Marie Dietz, with her, and we all went to there, to the dance and to the supper and that was the first time I had ever met her. Then we had written, sent cards to each other, we rather liked each other and we sent cards to each other and I wrote letters to her and when I had gone back to visit my father and mother at home in Pittsburgh, I had met her and had seen her and she wrote cards to me and I sent cards to her and I saw her several times on my visits back to Pittsburgh and she wrote me that she was coming to Columbus and she did come to Columbus and I met her on the third Sunday of August, which, according to the calendar makes it August 17th, when she got there. We talked about - - -

"THE COURT: Had she been living in Pittsburgh?

"THE WITNESS: She was living in Pittsburgh at the time. So she came here and she says, well, she says, 'I am here, going to stay here.' I said, 'Well', I said 'that is a rather peculiar condition. The only things for us to do if you are going to stay here is to get married ' It was Sunday and she said, well, she says 'Why should we need to worry about that?' And so I said to her, I said, 'Well, there is only one thing to do, either that, today is Sunday and you can't get married or we will have to wait.' She says, well, she says, 'We can take each other in marriage and be just as good as ever.' I said, 'Well, if you want it that way, all well and good.' And I had a little ring on my finger that had three little stones in it and I took it off my finger and handed it to her and I says, 'Well, if that is the case, I will be your husband and I will treat you right and here is the ring.' She took the ring off her finger and gave it to me and says, 'I will be your wife and do the right thing by you and be true to you at all times.' I said 'All right', and we embraced each other and kissed and we then left, went up to - -"

Upon further examination of Mr. McKee we find that there was no witness whatsoever to this alleged conversation and procedure. There is no direct testimony except the testimony of Mr. McKee himself. There is some strong circumstantial evidence, however, in favor of Mr. McKee in the fact that he and the woman from that time on did live together and hold themselves out as husband and wife up until the time of her death.

It is apparent from the testimony that Mr. and Mrs. McKee associated with an excellent class of people and were highly respected by all of their associates. But the fact that a man, and woman hold themselves out as husband and wife, and succeed in making their associates believe they are husband and wife, is not the best evidence of a marriage. A man and woman living in adultery, if skillful, will do exactly as Mr. and Mrs. McKee did.

Skillful adulterers will succeed many times in convincing their friends by their conduct that they are man and wife. So, in spite of the fact that Mr. and Mrs. McKee did hold themselves out as man and wife for a period of sixteen or eighteen years, we cannot consider that as any conclusive evidence as to the consummation of a marriage contract.

The testimony discloses that Mr. McKee was a deputy for a number of years in the office of H. Sage Valentine, when he was acting as the Auditor of Franklin County. He also was a deputy for a number of years in the office of Arthur J. Thatcher, while he was Auditor of Franklin County. For a number of years Mr. McKee was employed across the hall from the Probate Court where he could have obtained a license to wed the woman of his choice. Although he was more than forty-four years of age and married a woman who had participated in two ceremonial marriages, and, although he was employed in the office under the same roof as the Probate Court, he never took the precaution to obtain a marriage license and marry and perpetuate the evidence of same by having a ceremonial marriage.

Our attention has also been called to the fact that one or two notes had been given by Mr. McKee to his alleged wife some years after their marriage. These notes were not made payable to Marie McKee, but to Marie Dietz. This, at least, is some evidence that William McKee and Marie, in their private dealings with each other did not deal between themselves as husband and wife, but as persons not related by marriage.

The court has also examined the will of Marie McKee which has been admitted to probate in this Court. We find that Marie McKee gives all of her property to her two daughters, and she directs that "W. S. McKee" administer the estate for the benefit of her two daughters. It is significant that she does not refer to W. S. McKee as her husband. As far as any expression in the will is concerned Mr. McKee is nothing more than a mere acquaintance or friend. Inasmuch as it is almost a universal practice for a husband or wife to refer to their consort as husband or wife in making their wills, we consider this last named circumstance to be quite significant.

It is significant that the latest pronouncement of the Supreme Court contained in 135 Oh St at page 554, relative to the degree of proof required to sustain a common-law marriage is greater than that announced in any former decision. It is also quite generally known that the legislatures of the various states are legislating and contemplating legislation restricting the rights of marriage, and in many states they completely out-lawed so-called common-law marriages. It is also significant that the Supreme Court of Ohio in its latest pronouncement has also held that a common-law marriage would only be held valid to protect the rights of innocent persons. In this case no children were born of the marriage. Mr. McKee is certainly not an innocent party, and the court therefore has no duty to sustain the marriage solely for the protection of Mr. McKee.

This court would be greatly pleased to give the testimony of Mr. McKee full credibility, but the circumstances of the alleged marriage are so foreign to what this court considers people of their age and experience would do, that we are unable to accept the same as a statement of fact. Should the court accept the testimony as shown by the record as establishing a valid common-law marriage, we would then be throwing the bars down to such an extent as to invite similar conduct in future cases.

Our conceptions of a court's duty in such a case is admirably stated by Judge Huron in his well known opinion reported in 9th Cir. Court Reports, N. S. at page 286, where he uses the following language:

"But common-law marriages, however we are to understand that term, are not yet so common as to be recognized anywhere as anything but exceptional. Our marriage laws are, and have always been, well known and un-

38

derstood, and a legitimate ceremonial marriage, either civil or religious, is the universal desire of all decent people contemplating matrimony.

To break down the bars established by the statute, to make possible the substitution of loose and uncertain requirements for the time honored, fixed forms of the law is to open the way to all the forms of fraud and crime with which designing men may seek to destroy womanly virtue and with which unscrupulous woman may seek to appropriate the good name and wealth of men to whom in life they were perhaps perfect strangers.

If a private arrangement without any formalities, and without any writing or any record or any witnesses, is to be upheld as a civil contract; if secret marriages, known only to the parties themselves and participated in by none other are to be authorized; if the state is to have no right to protect its own interests, it is but one step further to the practice, now publicly advocated by certain notorious criminals and others, of having marriages on probation. the relation to cease at the will of either of the parties.

If such is to be the law of Ohio, some other court must be the first to proclaim it."

We therefore are compelled to come to the conclusion that the ▮▮▮▮ testimony adduced in support of the alleged marriage between Marie Dietz and William S. McKee falls far short of that degree of proof, which, in the mind of this court is clear and convincing. We therefore hold that William S. McKee is not the surviving spouse of Marie McKee, and as such, is not entitled to participate in her estate.

An order may be drawn accordingly.